IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| CARLETON G. SHAW, | : | |
|     *Plaintiff,* | : | CIVIL ACTION No.: |
| vs. | : | |
| | : | |
| HIBU PLC, | : | |
| | : | |
|   and | : | |
| | : | **JURY TRIAL DEMANDED** |
| HIBU INC., | : | |
| | : | |
|     *Defendants.* | : | |

## COMPLAINT

## PRELIMINARY STATEMENT

On January 16, 2013, Plaintiff Carleton G. Shaw ("Shaw"), a dedicated employee of hibu, Inc. ("hibu") (or a predecessor in interest) for nearly twenty-three years, was terminated during a routine meeting with his direct superior, Mark Payne, hibu's Global Chief Operating Officer. For reasons more fully set forth below, Mr. Shaw was asked to cooperate in his termination by going along with an announcement scheduled for the next day in which he would agree to say that he had chosen to step down from his position as Global Chief Information Officer to pursue other interests. In return for his cooperation, and consistent with more the 22 years of company past practice, Mr. Payne promised Mr. Shaw a full and complete severance package including: (i) four (4) weeks' base salary; (ii) plus an additional week's pay for each year of employment; (iii) plus a prorated portion of his FY2013 bonus, which Mr. Payne promised he would rate at 100%; (iv) plus prorated portions of two Long Term Incentive Awards; (v) one Long Term set of Option Awards; (vi) one Deferred Cash Incentive Award; (vii) Legal Fees; and (viii) other incidental allowances (e.g., permitting Mr. Shaw to keep certain

5982584

used software and equipment then in his possession). Mr. Shaw reluctantly agreed to these terms and was referred to Christian Wells, hibu's General Counsel, to wrap up the details of Mr. Shaw's departure from the company. Now, nearly four years since separation from the company, Mr. Shaw has not received the promised severance package.

**THE PARTIES, BASIS FOR JURISDICTION AND VENUE**

1. Plaintiff Carleton G. Shaw is an adult citizen of Houston, Texas, with a residence located at 121 N. Post Oak Lane, #2706, Houston, Texas 77024. Mr. Shaw is called "Gary Shaw."

2. Defendant hibu, PLC, formerly, Yell Group, PLC, the global entity, is a privately held corporation with its headquarters located in the United Kingdom, at One Reading Central Forbury Road, Reading Berkshire. Upon information and belief, hibu PLC's principal place of business is also in the United Kingdom. hibu PLC regularly conducted business in the United States through its wholly owned subsidiary, hibu, Inc.

3. hibu, Inc., formerly, Yellowbook, Inc., is a Delaware Corporation with its principal place of business located at 2201 Renaissance Boulevard, King of Prussia, PA 19406. hibu, Inc. is the United States business entity of hibu, PLC.

4. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) based upon complete diversity of citizenship between the parties. The amount in controversy, exclusive of costs and interest, exceeds the sum of $75,000.00.

5. This Court may exercise personal jurisdiction over the Defendants because hibu, Inc. and hibu PLC do business within the Southern District of Texas and has continuous and systematic contacts with the State of Texas. In addition, the Defendants' activities giving rise to this Complaint took place within the State of Texas.

6.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the activities giving rise to the cause(s) of action described in this Complaint occurred within this District and the Plaintiff suffered harm within this District.

## FACTUAL BACKGROUND

7.     Mr. Shaw joined Yellowbook on May 21, 1990 as Vice President of Operations, based in Rockville Center, New York and moved his family there from San Antonio, Texas.

8.     When Mr. Shaw joined Yellowbook, company revenues were approximately $50 million. By 1996, revenues had grown to approximately $90 million. Over the next 12 years, Yellowbook began a series of acquisitions and new directory starts that resulted in U.S. revenue growth to more than $2 billion USD (2,000%+) by 2008, expanding the company's geographic footprint from solely New York, New Jersey and Florida to the entire United States.  Mr. Shaw was responsible for Yellowbook's technology, acquisition integrations and facilities for 70 acquisitions during this time period.

9.     In August of 1999, Yellowbook was acquired by Yell Group, PLC with Mr. John Condron as Group CEO.  Yell Group ultimately had publishing operations in the UK, Spain, Argentina, Chile and Peru and operational sites in India and in the Philippines. Yellowbook continued to operate autonomously in the U.S. with Mr. Joseph Walsh as CEO, reporting to Mr. Condron.

10.    By 2002, Mr. Shaw had been promoted to Chief Information Officer and Head of Change Management for Yellowbook, continuing to report to Mr. Walsh.

11.    In November, 2007, Mr. Shaw relocated to Houston, Texas, continuing his duties from his home office.  Mr. Shaw's home office was recognized by the company as his

official office, both when the company was Yellowbook, and eventually when it became hibu. Although Mr. Shaw's officially recognized business address was at his home office, several other officers and senior managers of hibu had offices in the greater Houston, Texas area where hibu maintained business operations.

12. From May 1990 when Mr. Shaw joined the company through April 2009, Yellowbook's U.S. sales and operations process were completely paper based. In April 2009, Mr. Shaw led a company-wide, highly successful transformation process, which resulted in rolling out laptop computers to more than 4,000 sales representatives in just twelve months to streamline operations and reduce paper. This project was complete by the end of March, 2010. Within nine (9) months of completion of the project, the formerly paper-based sales force was automated, with 97%+ of all orders going through the system automatically.

13. In 2009, Yell plc underwent a complete refinancing and recapitalization, resulting in the business being funded primarily through approximately three hundred bank loans, as set forth in the facilities agreement with its lenders (the "2009 Lenders").

14. As it struggled to meet its obligations to the 2009 Lenders, in the summer of 2010, the company's board of directors instructed Mr. Walsh to look for potential purchasers of Yell plc's United States assets, including Yellowbook. It had become clear that there was a major rift growing between the Board and the Lenders.

15. On December 23, 2009, Mr. Shaw was awarded 513,380 stock options at a zero strike price with a vest date December 23, 2012.

16. In April, 2010, Mr. Condron, CEO of Yell Group, commissioned Deloitte to conduct an audit of IT costs for each of the company's IT divisions and to deliver a report for the

Yell, PLC board. The results showed that Mr. Shaw's U.S. IT costs were only 25% of the global Yell, plc IT costs, while the US business represented 50% of Yell's global revenue. This, and other accomplishments, ultimately led to Mr. Shaw's promotion to Global Chief Information Officer in July, 2011.

17. In May 2010, Mr. Condron announced his intent to retire by the end of the year. For the balance of 2010, the Yell, Plc Board conducted a search for a new CEO.

18. In December, 2010, Mr. Walsh, in accordance with the Board's express permission, secured an offer to purchase the U.S. business lines, but the offer was rejected by the Board.

19. In January, 2011, J. Michael Pocock was appointed CEO and member of the Board of Directors. Mr. Pocock held himself out as a workout/reorganization specialist. Shortly after Mr. Pocock was hired, he expanded his global management team to include Mark Payne, COO, and others, each of whom had previously worked with Pocock at other companies. Mr. Walsh remained as President of the U.S. business, but Mr. Shaw began reporting directly to Mr. Pocock. Mr. Pocock's first directive to Mr. Shaw was to form a global team of hibu's IT and Change Management executives and to begin planning to integrate all of hibu's IT and Change Management organizations into a single unit. Working with the Deloitte team that had conducted the 2010 Global IT audit, Mr. Shaw formed hibu's Global Technology Leadership Forum ("GTLF"). In February, 2011, Mr. Payne joined the firm. Mr. Shaw then began reporting to Mr. Payne instead of to Mr. Pocock.

20. On June 8, 2011, Mr. Shaw was awarded a Long Term Incentive Package (LTIP) valued at $136,000 on its vesting date, November 13, 2013.

21. In July, 2011, after a six month study with outside consultants, Mr. Pocock

5

announced the company's "new strategy." The new strategy called for the implementation of new partnerships (e.g. Microsoft, Apple) and approximately eight new product/service initiatives:

- i.) eMarketplace;
- ii.) Affinity Card;
- iii.) Loyalty;
- iv.) Payments;
- v.) Campus Services;
- vi.) eCommerce;
- vii.) Magazine Publishing;
- viii.) Industry Verticals.

22. On July 26, 2011, Mr. Shaw was promoted to Global Chief Information Officer ("GCIO"). In this new role, he continued to report to Mr. Payne. Mr. Shaw's new role also included responsibility for all Global Project Delivery (i.e. implementation of the new strategy).

23. After the new strategy had been announced, Mr. Shaw asked Mr. Payne about the priority level of each new product/service that made up the new strategy (i.e. what should be first, second, third, etc.), so the company could take an organized approach to execution. Mr. Payne's response was, "they are all top priorities." Mr. Shaw expressed incredulity, explaining that with all the budget reductions, the company did not have the resources to give each new product/service equal priority in execution. Mr. Payne's response was that Mr. Pocock wanted to move them all to move forward at the same time.

24. This sort of conversation about implementing the new strategy in its entirety without regard for prioritizing the action items continued throughout the company. Pocock and

6

his team developed a negative reputation among the employees for being good only at PowerPoint slide presentations, but utterly lacking in the ability to execute the vision laid out in the slides.

25. On September 9, 2011, Mr. Shaw was awarded a second Long Term Incentive Package (LTIP) valued at $136,000 on its vesting date June 28, 2014.

26. On or about October 20, 2011, Mr. Walsh was unceremoniously terminated and paid full severance consistent with the long-standing practice at the company when a senior manager or executive was terminated.

27. From Walsh's termination forward, and until Mr. Pocock's departure in 2014, in the execution of his political agenda, Mr. Pocock began escalating his "heavy-handed tactics" such as authorizing actions that appeared to Mr. Shaw to be a "witch hunt."

28. Some tactics contributing to this observation were the systematic logging and tracking of phone calls made by select employees as well as the review of recordings of employees' voicemails, text messages and emails. Based on arbitrary factors, employees subject to this kind of scrutiny were fired for what can only be the appearance disloyalty to Mr. Pocock, regardless of whether the calls and/or messages demonstrated any kind of misdeed, let alone disloyalty.

29. During this witch hunt it seemed that prior association and loyalty to former CEO Mr. Walsh was sufficient grounds for termination, regardless of evidence of any disloyalty to the company (of which there was none).

30. On November 9, 2012 (during this tense period), Mr. Shaw was awarded a Deferred Compensation Incentive Package (DCIP) valued at $120,000 on its vesting date, March 31, 2013.

31. By the end of 2012, Mr. Shaw and his team had exceeded all defined expectations including integration of the global IT and Change Management organizations, reducing the global headcount by more than 35% (from 1,300 to just over 800), reducing the global IT budget by 33% $240 million to $160 million and completing the consolidation of more than 15,000 email accounts from different platforms to a single global exchange platform.

32. Nonetheless, on January 16, 2013, Mr. Shaw was terminated abruptly and without warning during a routine meeting with his direct superior, Mr. Payne, hibu's Global Chief Operating Officer. In that meeting, Mr. Shaw was told he had done a great job, but that he was being made "redundant." Mr. Shaw was then asked to cooperate in what was, apparently, a larger, planned reorganization by going along with an announcement scheduled for the next day in which Mr. Shaw would agree to say that he had chosen to step down from his position as Global Chief Information Officer to pursue other interests. In return for his cooperation, and consistent with more than 23 years of company past practice, Mr. Payne promised Mr. Shaw a full and complete severance package.

33. Consistent with the long-standing company policy, the package was to include: (i) four (4) weeks' base salary; (ii) plus an additional week's pay for each year of employment; (iii) plus a prorated portion of his FY2013 bonus, which Mr. Payne promised he would rate at 100%; (iv) plus prorated portions of two Long Term Incentive Awards; (v) one Long Term set of Option Awards; (vi) one Deferred Cash Incentive Award; (vii) Legal Fees; and (viii) other incidental allowances (e.g., permitting Mr. Shaw to keep certain used software and equipment then in his possession).

34. Mr. Shaw reluctantly agreed to these terms and was referred to Christian Wells, hibu's General Counsel, to wrap up the details of Mr. Shaw's departure from the company.

35. On January 17, 2013, Mr. Payne issued a company-wide memorandum announcing Mr. Shaw's departure from the company and stated as follows:

> I am … announcing today that Gary Shaw has decided to leave the Company after a career of nearly 23 years. Gary has worked through tremendous change and supported the business over his time with Yellowbook. Throughout this time he has played an important role in supporting the business. I would like to thank Gary for his solid contributions to the business and wish him every success in the future.

36. Between January 18, 2013 and April 15, 2013, Mr. Christian Wells, General Counsel for hibu and Mr. Shaw conducted negotiations regarding the wording of Mr. Shaw's severance package. The material terms, however, were agreed to on January 16, 2013 at a meeting between Mr. Shaw and his supervisor, Mr. Payne.

37. On April 19, 2013, with the wording of the Severance Agreement nearly complete, and Mr. Shaw having fulfilled his side of the agreement made with Mr. Payne and Mr. Wells that he would agree to represent to others that he voluntarily stepped down from his position with the company, Mr. Wells informed Mr. Shaw that hibu had changed its mind and was not going to honor the hibu side of the agreement to pay Mr. Shaw the agreed upon severance package.

38. Mr. Wells further explained that the basis for hibu's decision was the company's "suspicion" that Mr. Shaw may have acted disloyally in exchanging phone calls with his former boss, Joseph Walsh. For 23 years Mr. Shaw had routinely spoken with Mr. Walsh on business and personal matters. Nothing had change except Mr. Pocock's paranoia.

39. Mr. Walsh and Mr. Shaw had known each other for 24 years and Mr. Walsh had become a friend and mentor to Mr. Shaw. On or about April 20, 2012 hibu sued Mr. Walsh for allegedly attempting to procure confidential information from hibu executives seeking, among other things, the return of Mr. Walsh's $1.7m severance package. In July, 2013, the suit between

9

5982584

hibu and Mr. Walsh was settled. It came as no surprise that on October 17, 2013, hibu announced that Mr. Pocock would step down in early 2014, when the restructuring was complete.

40. Near the end of Mr. Pocock's tenure as CEO, hibu plc stock, formerly a member of the prestigious FTSE 100 had been declared worthless and was delisted from the UK stock exchange. Soon after Mr. Pocock and his team exited from the company in 2014, virtually every element of Pocock's strategy had failed. The company had returned to the products/services that were in place four (4) years prior when Pocock and his team arrived.

41. As of this filing, even with Mr. Pocock and his "draconian" approach to management gone, the current senior leadership of hibu refuses to correct its mistake and pay Mr. Shaw what is due him for 23 years of service and as expressly agreed to on January 16, 2013 at the meeting between Mr. Payne and Mr. Shaw.

## COUNT I: BREACH OF CONTRACT

42. Plaintiff incorporates by reference each of the foregoing paragraphs as though more fully set forth below.

43. On or about January 16, 2013, Mr. Shaw and the Defendants reached an agreement as to all material terms regarding a severance package to be paid him upon termination of his employment.

44. Although Mr. Shaw had been a long-term, long-standing, well regarded and highly motivated employee of the Defendants (or their predecessor in interest) for nearly a quarter of a century, Mr. Shaw was terminated without cause.

45. Mr. Shaw did not want to separate from his employment, but reluctantly agreed to go along with the termination plan because the company offered him the following

generous severance package: (i) four (4) weeks' base salary; (ii) plus an additional week's pay for each year of employment; (iii) plus a prorated portion of his FY2013 bonus, which Mr. Payne promised he would rate at 100%; (iv) plus prorated portions of two Long Term Incentive Awards; (v) one Long Term set of Option Awards; (vi) one Deferred Cash Incentive Award; (vii) Legal Fees; and (viii) other incidental allowances (e.g., permitting Mr. Shaw to keep certain used software and equipment then in his possession).

46. This severance package was wholly consistent with the long-standing practice at the company and with the package offered to other members of the Senior Management Team who were terminated at or around the same time, when Mr. Pocock's plans to stimulate and/or generate revenue at the company failed.

47. Mr. Shaw relied on the promise of this severance package when he agreed to leave the company on the terms described above in the introduction.

48. It took Mr. Shaw nearly two (2) years to find alternate employment after his termination.

49. The Defendants refused to pay the severance package after Mr. Shaw complied with his duties and obligations under the agreement reached on January 16, 2013. Therefore the contract between the parties was breached by the Defendants.

50. Mr. Wells acknowledged that the agreement had been reached, yet refused to honor it and continues to refuse to honor it.

51. The value of the severance package (exclusive of counsel fees, which continue to accrue) is approximately $515,530.00.

52. Further as a consequence of termination and not having a full time job for nearly two years between January 16, 2013 and November, 2014, Mr. Shaw did not make his full salary, plus the value of the various hibu incentive plans available to him. If he had remained at hibu, and assuming he met the criteria of the incentive plans that were part of his compensation package at the time, between January 16, 2013 and October 2014, Mr. Shaw would have earned $1,327,913.00.

53. Mr. Shaw is entitled to recover this amount, less any money he actually made as a result of part time work.

54. Mr. Shaw is also entitled to recover any and all counsel fees associated with the enforcement of the Severance Agreement because legal fees were specifically negotiated. That amount continues to accrue.

## REQUEST FOR ATTORNEYS' FEES

55. Plaintiff incorporates by reference each of the foregoing paragraphs as though more fully set forth below.

56. Mr. Shaw is entitled to recover his attorneys' fees incurred in connection with this lawsuit pursuant to the terms of the agreement reached between the parties on or about January 16, 2013. Defendants expressly agreed to pay Mr. Shaw's legal fees as part of the agreed upon severance package. Plaintiff is also entitled recover legal fees pursuant to Texas Civil Practice & Remedies Code § 38.001(8) because Defendants breached their contract with Mr. Shaw. Mr. Shaw is represented by an attorney, has presented his claim to Defendants, and payment for the amount owed was not paid within thirty (30) days.

## **CONDITIONS PRECEDENT**

57. All conditions precedent to Plaintiff's right to recovery have been performed, have occurred, or have been waived or excused.

## **JURY DEMAND**

58. Plaintiff Demands a trial by jury on all issues triable by jury.

[SPACE INTENTIONALLY LEFT BLANK]

5982584

## PRAYER

WHEREFORE, Plaintiff Carleton G. Shaw requests that Defendants be cited to appear and answer herein and further seeks judgment against the Defendants in an amount in excess of $75,000 in compensatory damages, both liquidated and consequential, for breach of contract, together with attorneys' fees, interest and costs.

Respectfully submitted:

**PORTER HEDGES LLP**


**/s/ Eugene M. Nettles**
EUGENE M. NETTLES
*Attorney-in-Charge*
Texas Bar No. 14927300
S.D. Texas No. 69593
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6609 (Tel.)
(713) 226-6209 (Facsimile)

and

**HAINES & ASSOCIATES**


CLIFFORD E. HAINES (PA 09882)
*Application for pro hac admission to be filed*
The Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107
(215) 246-2200 (Tel.)
(215) 246-2211 (Facsimile)

*Attorneys for Plaintiff Carleton G. Shaw*

Dated: January 13, 2017

5982584